IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: TEMANI ME'CHELLE ADAMS   §   Misc. No. 3:20-MC-008-M

Before FITZWATER and MEANS, Senior District Judges, and LINDSAY, District Judge.

SIDNEY A. FITZWATER, Senior District Judge:

In this attorney discipline matter, we are asked to decide whether Temani Me'Chelle Adams, Esquire, a member of this court's bar, is subject to disciplinary action under this court's local civil and criminal rules for alleged misconduct in three cases. Having considered the record and conducted an evidentiary hearing, we find by clear and convincing evidence that Ms. Adams committed misconduct, as defined by this court's local criminal rules, in two of the cases. We conclude that the least restrictive sanction necessary to deter the inappropriate behavior is a six-month suspension from this court's bar coupled with the requirement that Ms. Adams complete 15 hours of continuing legal education ("CLE") courses that are accredited by the State Bar of Texas and qualify for credit in legal ethics.

I

This matter arises from Ms. Adams' alleged misconduct in three cases: *Dartson v. Villa*, No. 3:17-CV-0569-M, *appeal dismissed*, No. 18-11328 (5th Cir. Apr. 12, 2019), litigated before Chief Judge Lynn; *United States v. Spearman*, No. 3:18-CR-232-K(17), litigated before Judge Kinkeade; and *United States v. Contreras-Martinez* (*Contreras*), No. 3:18-CR-415-K(2), pending before Judge Kinkeade. On January 28, 2020 Chief Judge Lynn

issued a show cause order directing Ms. Adams to appear before this panel[1] and show cause why the panel should not impose disciplinary action for all or some of the following: (1) conduct unbecoming a member of the bar; (2) failure to comply with a rule or order of the court; (3) unethical behavior; and (4) inability to conduct litigation properly. These are grounds for disciplinary action under N.D. Tex. Civ. R. 83.8(b)(1)-(4) and N.D. Tex. Crim. R. 57.8(b)(1)-(4).[2]

The show cause order also appointed Dawn Estes, Esquire, to assist the panel, as provided in Local Civil Rule 83.8(g) and Local Criminal Rule 57.8(g). Ms. Estes investigated the matter and filed her report of investigation on April 7, 2020 ("Estes

---

[1]The panel is acting under authority delegated by Chief Judge Lynn and Judge Kinkeade as the presiding judges in their respective cases. The show cause order provides:

> The judges in the three cases referenced above have delegated to the panel their authority under the local civil and criminal rules to hear and dispose of the issue of whether and if so, what disciplinary action should be taken against Ms. Adams as result of her conduct in the cases before them. This delegation includes the authority to further specify the conduct that the panel will examine.

Jan. 28, 2020 Order at 2.

Our court has previously made similar referrals to three-judge panels in attorney discipline matters. *See, e.g., In re Smith*, 100 F.Supp.2d 412, 416 (N.D. Tex. 2000) (en banc) (per curiam) (reciprocal discipline matter); *In re Smith*, 123 F.Supp.2d 351, 361 (N.D. Tex. 2000) (per curiam) (three-judge panel ruling in reciprocal discipline matter), *aff'd*, 275 F.3d 42 (5th Cir. 2001) (unpublished table decision).

[2]In *Dartson* the show cause order identified ground 4, in *Spearman* grounds 1 and 3, and in *Contreras* grounds 1, 2, 3, and 4.

Report").

Regarding the *Dartson* lawsuit, the Estes Report concludes that "[w]hile Ms. Adams made mistakes in the representation of her client in this matter, [Ms. Estes does] not believe her conduct demonstrated an inability to conduct litigation properly." Estes Report 2. Based on this conclusion, the panel ruled in a June 29, 2020 order that it would not further consider this alleged violation. As for *Spearman* and *Contreras*, the Estes Report finds that Ms. Adams is subject to discipline on each ground asserted in the show cause order.

Ms. Adams filed an unsworn response to the Estes Report, including an unsworn declaration,[3] on May 29, 2020 ("Adams Response"), in which she largely disputes the facts and arguments presented in the Estes Report and opposes the imposition of discipline.

The panel held a hearing on August 4, 2020 at which Ms. Estes and Ms. Adams were permitted to offer argument and evidence in the form of witnesses and exhibits. Ms. Estes presented argument and introduced her report and supporting exhibits, successfully requested that the panel take judicial notice of the case files in *Spearman* and *Contreras*, and offered

---

[3]In her response, Ms. Adams provided the following excuse for submitting an unsworn declaration in support of her opposition to the Estes Report:

> Also attached, as Exhibit T, is the unsworn declaration of Temani Adams. Ms. Adams had a temperature of 99 degrees at the time of the creation of the declaration. Ms. Adams did not want to risk the safety of herself or others during the current pandemic, to swear to the declaration.

Adams Resp. 1-2. We find that this assertion strains credulity considering that Ms. Adams had readily available the option of signing her declaration under the penalty of perjury, *see* 28 U.S.C. § 1746(2), which would not have required that she risk anyone's safety.

the testimony of three witnesses.  Ms. Adams presented argument but did not testify, call witnesses, or introduce other forms of evidence.  Given her unsworn declaration, *see supra* note 3, absence of witnesses, and failure to testify at the show cause hearing, Ms. Adams has essentially offered no sworn testimony in opposition to the case for imposing attorney discipline.

Following the hearing, the panel took the matter under advisement.

II

We apply a clear and convincing evidence standard when deciding whether Ms. Adams has engaged in misconduct that subjects her to discipline.  *See, e.g., Sealed Appellant 1 v. Sealed Appellee 1*, 211 F.3d 252, 254-55 (5th Cir. 2000).  "Clear and convincing evidence" is evidence that

> produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*In re Mole*, 822 F.3d 798, 803-04 (5th Cir. 2016) (per curiam) (internal quotation marks omitted) (quoting *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992)) (defining "the 'clear and convincing' evidentiary standard" in "attorney disciplinary proceedings").

When, as here, an independent attorney is appointed to "investigate and report on the conduct of [an accused attorney]," the "burden of proof remain[s] at all times with [the appointed attorney]."  *Sealed Appellant 1*, 211 F.3d at 255.  But "it [i]s incumbent upon [*the*

- 4 -

*accused attorney*] to *rebut* th[e] evidence" against her.  *In re Grodner*, 2014 WL 4365080, at *5 n.5 (M.D. La. Sept. 2, 2014) (emphasis added), *aff'd*, 587 Fed. Appx. 166 (5th Cir. 2014).

III

We turn first to the allegations of misconduct that arise from Ms. Adams' representation of a criminal defendant in *Spearman*.

A

In *Spearman* Ms. Adams represented defendant Detonte Laserria Spearman ("Spearman") as his retained counsel.  Spearman, one of 18 defendants in a multi-count indictment, was charged with conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846, and possession with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(b)(1)(C).  The conspiracy allegedly began on May 2, 2017 and continued until May 8, 2018.  Spearman was arrested on May 16, 2018.

1

During its investigation of the case, the government became concerned that Ms. Adams was involved in an intimate relationship with Spearman.  On December 17, 2018 the government filed a sealed notice to the court of potential conflict and request for hearing ("Notice of Potential Conflict"), alleging that the relationship between Spearman and Ms. Adams had interfered with her professional judgment and appeared to have raised a conflict of interest, in violation of Rule 1.06(b)(2) of the Texas Disciplinary Rules of Professional Conduct ("Texas Disciplinary Rules").  The Notice of Potential Conflict cited three reasons

- 5 -

in support: (1) before Spearman was arrested, agents of the Drug Enforcement Administration ("DEA") conducting surveillance observed a 2016 Maserati registered to Ms. Adams parked at Spearman's residence on at least one occasion; (2) agents conducting a search of Spearman's residence on May 16, 2018 recovered a photograph of Spearman with Ms. Adams taken in a photo booth; and (3) agents recovered a cell phone used by Spearman that contained numerous text messages between a cell phone subscribed to by Ms. Adams and Spearman's cell phone, several of which reflected that Spearman and Ms. Adams were involved in a sexually intimate relationship. The government maintained that Spearman and Ms. Adams had been involved in this intimate relationship as recently as the date of Spearman's arrest, and that the relationship was ongoing during the period of time when Spearman was involved in the drug conspiracy alleged in the indictment.

The government acknowledged that sexual relationships that predated the attorney-client relationship were not automatically prohibited under the Texas Disciplinary Rules, but it argued that such a relationship could constitute a conflict of interest under Rule 1.06(b) where it reasonably appeared that Ms. Adams' representation of Spearman was adversely limited by her own interests. The government maintained that Rule 1.06(b) recognized that a romantic relationship between an attorney and her client could serve as an obstacle to the attorney's effectiveness and judgment; that a lawyer who was the client's lover could not maintain the required professional independence and emotional distance required to act competently as the client's clear-headed counselor and representative; and that such a relationship could blur the line between when the attorney was acting in the capacity of a

legal advisor and when she was acting as a girlfriend.

The government contended that such a situation clearly existed in Spearman's case because, despite substantial evidence of Spearman's guilt and his role in the conspiracy (including his confession and proffer to law enforcement), his cooperation with government agents, and indications that he did not want a trial, his attorney and apparent girlfriend had engaged in a defense strategy that did not benefit him.  According to the government, Ms. Adams' conduct included using social media to make racially charged, baseless claims directed at the government and law enforcement agents, and communicating to codefendants' counsel false claims of illegal and unethical conduct on the part of DEA agents and charges of bias and false claims of misconduct directed at prosecutors.

The government asserted that Ms. Adams' conduct had poisoned any future relationship among Spearman, DEA agents, and the government and had made it impossible for Spearman to help himself going forward; that Ms. Adams continued to pursue a strategy of making false and malicious claims against the government while knowing that she and Spearman were involved in an intimate relationship that was never revealed to the government or to the court; and that Ms. Adams' actions were directly related to her relationship with Spearman and therefore might present a prohibited conflict under Rule 1.06(b)(2).  The government requested a hearing so that the court could (1) confirm the existence of an intimate relationship between Spearman and Ms. Adams; (2) fully explain to Spearman that such a relationship could serve as an obstacle to Ms. Adams' effectiveness; (3) confirm that Spearman understood Ms. Adams' course of action in the case, agreed with

her strategy, and waived any potential conflict that might exist; and (4) if Spearman desired, appoint new counsel unencumbered by the potential conflict.

Ms. Adams opposed the government's request. She maintained that the government's motion had been filed in response to a motion to dismiss the indictment with prejudice that she had filed several days earlier on December 6, 2018. Ms. Adams also filed on Spearman's behalf a January 24, 2019 notice of discovery abuse and request for sanctions. Judge Kinkeade referred the government's December 17, 2018 Notice of Potential Conflict and Spearman's January 24, 2019 request for sanctions to United States Magistrate Judge Toliver. Judge Toliver convened a hearing on both matters on February 6, 2019. After first addressing whether Ms. Adams should be disqualified and removed as Spearman's counsel and determining that she should be, Judge Toliver denied Spearman's request for sanctions as moot.

Toward the beginning of the February 6, 2019 hearing, Ms. Adams' role as a potential witness was raised. In response to questioning from Judge Toliver, the government argued that Ms. Adams had known all along that there was a conflict. This was so, the government urged, because she had taken the proactive step of contacting the filter team (the group of Assistant U.S. Attorneys responsible for filtering materials protected by the attorney-client privilege) and had denied that she was the author of most of the text messages that appeared to have been written by her to Spearman. A review of the contents of Spearman's cell phone had revealed more than 1,440 text messages sent and received at all hours between a cell phone subscribed to by Temani Adams PLLC and Spearman's cell phone. In a September

2018 email, Ms. Adams told the filter team lawyers that Spearman had contacted her a handful of times at the phone number that was the subject of the Notice of Potential Conflict ("9779 Line"), but she claimed that the 9779 Line was assigned to a contract paralegal who formerly worked with her and had dated Spearman at one time.  Ms. Adams asserted: "My contact information is saved in Mr. Spearman's phone several different ways.  Most of the messages that are listed under my name aren't from me."  Estes Report Ex. B at 6.  In response to the filter team's request for more information, she stated: "the majority of the text messages under Temani aren't from me."  *Id.* at 4.

When Judge Toliver inquired whether Ms. Adams' initial denial of her authorship of the texts would be an issue, the government responded that it was "a factor" considering that the investigation in the case involved potential money laundering and the texts between phones contained one from Ms. Adams to Spearman that stated: "Good morning, Babe.  Will you please bring me $217,000 plus tax to my office?  I need to buy a new car."  Spearman Hrg. Tr. 8.[4]  The government maintained that in a long-term, large-scale drug trafficking investigation where a defendant had openly admitted trafficking kilogram quantities of cocaine, this particular text would be a red flag on the money laundering side, and would be a text that the government would certainly seek to use at trial.[5]  When Judge Toliver inquired

---

[4]"Spearman Hrg. Tr." means the sealed transcript of the February 6, 2019 hearing before Judge Toliver on the government's December 17, 2018 Notice of Potential Conflict and Spearman's January 24, 2019 request for sanctions.

[5]Although the panel concludes below, under a clear and convincing evidence standard, that it cannot exclude the possibility that the text in question was simply a joke, it is notable

whether the government was suggesting that Ms. Adams might be a witness, government counsel responded: "I'm not suggesting; I'm saying it is." *Id.*

Shortly after the exchange between Judge Toliver and government counsel, Ms. Adams pointed out that the government's written motion was not based on her being a witness at trial, and she moved for a continuance. Judge Toliver denied her request, concluding that the government had amended its motion, to the extent necessary, to present this ground, and that she would consider it. Judge Toliver did, however, adjourn the hearing for more than three hours so that, *inter alia*, Ms. Adams could file a written response to the argument that she had an actual conflict on the ground that she might be called as a witness based on the communications between her and Spearman.

After hearing the parties' presentations, Judge Toliver made an oral bench ruling.[6] She found that, prior to the initiation of the case, Ms. Adams was involved in an intimate relationship with Spearman and that she had an actual conflict because she was not functioning as effective counsel. Judge Toliver relied for support on several of the things she had observed in the evidence, including that Ms. Adams had attempted to serve subpoenas on the City of Dallas that were obviously for purposes that contravened Fed. R. Crim. P. 17,

_____

that this text was sent by someone who, during the course of the conspiracy, was driving a 2016 Maserati, an Italian automobile that (at least for some models) sells for six figures when new. And government counsel also asserted at the February 6, 2019 hearing that Ms. Adams had arranged for the purchase of a vehicle for her sister, he believed, in the name of her mother.

[6]Judge Toliver also issued a written order on February 6, 2019 that was consistent with her oral bench ruling.

- 10 -

and that Ms. Adams appeared to have violated several ethical rules.  Judge Toliver specifically found that Ms. Adams was at least a potential witness in the case.  She based this finding on the text messages, which she found were between Ms. Adams and Spearman; the government's proffer that the manner and means or overt acts in the case would involve allegations that Spearman conducted or attempted to conduct a business buying and selling autos using drug proceeds; very specific messages related to that venture between Ms. Adams and Spearman; and the government's proffer during the hearing that, if the case went to trial, it would subpoena Ms. Adams to testify on behalf of the government to these transactions.  Judge Toliver also found that there was a potential under the Texas Disciplinary Rules and the common law for an actual conflict of interest with Ms. Adams' testimony or potential testimony as a witness, and that, if she continued and refused to remove herself from these proceedings, this could possibly be the basis for some further discipline in this court as well as with the state bar, which created an adverse interest of counsel to that of her client.

Regarding the authorship of the text messages, Judge Toliver found that there was evidence that Ms. Adams had actually lied about whether she was the person identified in the text message conversations between her and Spearman presented in Exhibit B to the government's motion.  Judge Toliver found that the mere fact that Ms. Adams had been accused of lying on a matter that could be determined to be material to this case created an actual conflict between her own and Spearman's interests.  Finally, after finding that she would not accept from Spearman a waiver of the potential conflict of interest, Judge Toliver

disqualified Ms. Adams from representing Spearman.[7]

2

According to the Estes Report, despite Spearman's conduct that evinced a desire to avoid a trial and cooperate with the government, Ms. Adams adopted an aggressively combative posture with the government.  She accused government lawyers and agents of racism; claimed that government lawyers were unethical; filed grievances against government lawyers (which were dismissed by the State Bar of Texas); made at least one social media posting about government lawyers and the case; and accused a DEA agent of perjury.  The Estes Report indicates that the government viewed these actions as being in stark contrast to Spearman's confession and proffer with DEA agents, and it considered Ms. Adams' conduct to be threats and attacks that poisoned her ability to negotiate with the government on Spearman's behalf.

The Estes Report also concludes that Ms. Adams violated the rules related to highly confidential discovery documents marked DNR (Do Not Release)—which included a proffer from a cooperating defendant in the *Spearman* case—by taking photos with her phone of materials marked DNR and attaching them to pleadings filed in connection with a motion to

---

[7]During the hearing, the possibility was addressed that Ms. Adams could be a witness on the issue whether the search of Spearman's residence was consensual.  Based on Ms. Adams' phone conversations with Spearman before and after his arrest and her observation of events captured on since-deleted footage on his home security system, Ms. Adams maintained that Spearman had not consented to the search.  Although Judge Toliver did rely in disqualifying Ms. Adams on the potential for her to be called as a witness, she did not explicitly cite as a basis for her decision the potential that Ms. Adams could be called as a witness on the specific issue of consent to search Spearman's residence.

- 12 -

dismiss.

Further, Ms. Adams served two improper subpoenas on the City of Dallas related to officers involved in the case, and Judge Toliver quashed the subpoenas in response to a motion brought by the City of Dallas.

Finally, Ms. Adams sought third-party credit on behalf of Spearman based on the cooperation of another of her clients, despite the fact that such third-party credit is rarely given, and Ms. Estes believes that such a request raises suspicions and ethical issues.[8]

B

The Estes Report concludes that there are multiple grounds to discipline Ms. Adams for unethical conduct based on violations of the Texas Disciplinary Rules[9] and conduct unbecoming a member of the bar[10] during her representation of Spearman.

---

[8]Two Assistant U.S. Attorneys expressed the belief that Ms. Adams had recorded her telephone conversations with them. Although this was raised during testimony presented at the show cause hearing, Ms. Estes was not able to confirm that this occurred and did not include this alleged conduct in her report as a basis for discipline.

[9]Local Criminal Rule 57.8(e) defines "unethical behavior" "as conduct 'that violates the Texas Disciplinary Rules of Professional Conduct.'" *In re Warren*, 321 Fed. Appx. 369, 370 (5th Cir. 2009) (per curiam) (quoting LCrR57.8(e)).

[10]Although "conduct unbecoming a member of the bar" is not defined in the Local Civil or Criminal Rules, "the Supreme Court has interpreted the same language, as used in Federal Rule of Appellate Procedure 46, to mean 'conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice.'" *In re Hermesmeyer*, 688 Fed. Appx. 300, 305 (5th Cir. 2017) (per curiam) (quoting *In re Snyder*, 472 U.S. 634, 644-45 (1985)). "More specific guidance is provided by case law, applicable court rules, and the 'lore of the profession,' as embodied in codes of professional conduct." *In re Snyder*, 472 U.S. at 645; *see also, e.g., In re Discipline of Ray*, 2019 WL 3082523, at *7 (N.D. Tex. July 15, 2019) (McBryde, J.), *aff'd sub nom. In re Ray*, 951 F.3d 650 (5th Cir. 2020) (finding "conduct

According to the report, Adams violated Texas Disciplinary Rules 1.06(b)(2) and 3.08(a) and (c) because: she knew she had a conflict of interest while representing Spearman due to her potential role as a material witness, yet declined to withdraw; and because her personal relationship adversely affected her handling of his defense, which involved unnecessary personal attacks on government agents that damaged Spearman's ability to achieve a favorable resolution of the case (contrary to Spearman's expressed interest and detrimental to his ability to obtain a plea agreement), and that seemed intended to push the case to a trial. The Estes Report finds that Ms. Adams was required to withdraw under the Texas Disciplinary Rules considering the absence of evidence that Spearman was advised of the conflict or that he had consented to Ms. Adams' continued representation; and that she violated Texas Disciplinary Rule 3.08(a) by accepting and continuing employment when she knew she was a material witness on the issue of whether the searches of Spearman's residence were consensual, and that she should have withdrawn pursuant to Rule 3.08(b).

The Estes Report also relies on the text messages exchanged between Ms. Adams and Spearman, finding that the government's case involved allegations that Spearman had conducted or attempted to conduct a business buying and selling automobiles using drug

---

unbecoming a member of the bar" where attorney "engage[d] in fraud, misrepresentation, and misconduct that created a false record and provided fodder for false arguments by [a client] to this court and to the Fifth Circuit in the initial appeal"); *In re Luttrell*, 749 Fed. Appx. 281, 286 (5th Cir. 2018) (per curiam) (upholding district court's finding of "conduct unbecoming a member of the bar" where attorney actively disregarded client communications and failed to advise client of rights); *In re Jacques*, 972 F. Supp. 1070, 1071 (E.D. Tex. 1997) (holding that assaulting opposing counsel in courtroom, verbally abusing a lawyer during a deposition, and committing fraud on a client was "conduct unbecoming a member of the bar.").

proceeds, and that the text messages appeared to make Ms. Adams an adverse witness because the messages provided circumstantial evidence that supported the government's theory that Spearman was purchasing cars with cash from drug sales to launder money.  The report concludes that, despite being aware that she was a potential witness against Spearman and knowing that she had a conflict of interest, Ms. Adams not only failed to withdraw when questioned repeatedly by Judge Toliver during the February 6, 2019 hearing, she actively resisted withdrawing, and did so only when compelled by court order.  The Estes Report finds that Ms. Adams' failure to withdraw when faced with an obvious conflict also constitutes conduct unbecoming a member of the bar.

The Estes Report concludes next that Ms. Adams lied to the filter team attorneys about whether she was actually the person who sent the text messages that were attached to the government's Notice of Potential Conflict, providing an explanation that Judge Toliver did not believe and that is not believable when the text messages are read in full.

Finally, the Estes Report finds that Ms. Adams' highly unusual tactic of attempting to negotiate third party credit for information held by one client in favor of another client potentially violated Rule 1.06(b), and that her hostile attacks on agents and opposing counsel constitute conduct unbecoming a member of the bar.[11]

---

[11]The Estes Report also states that Ms. Adams' conduct in attempting to contact Spearman immediately after she was disqualified and after new counsel had just been identified was unsettling at best and at least potentially seemed to be an effort to circumvent the court's orders.  We will not address this further since it is not alleged to be sanctionable misconduct.

- 15 -

C

Although we are troubled by aspects of Ms. Adams' conduct in the *Spearman* case, including her lack of candor before Judge Toliver and this panel pertaining to her conduct as counsel to Spearman, we are unable—with one exception—to find under a clear and convincing evidence standard that Ms. Adams engaged in misconduct as alleged in the Estes Report. We find it unnecessary to explain in detail our decisions about the grounds that we decline to find rise to the level of misconduct. It is sufficient to note that there are enough questions about whether Spearman would have gone to trial or challenged his consent to search his residence to call into question whether Ms. Adams would have been an *adverse* witness who was required to withdraw;[12] whether the intimate relationship between Ms. Adams and Spearman that began prior to his arrest required that she withdraw; whether Ms. Adams' tactics were consistent with Spearman's decisions concerning objectives and general methods of representation; and whether Ms. Adams' actions in issuing subpoenas, copying and using DNR materials, and seeking third-party credit for one client based on another client's cooperation, even if questionable or improper, are also ethical violations.

The panel does find, however, that Ms. Adams committed misconduct, sanctionable under Local Criminal Local Rule 57.8(b)(3), for engaging in "unethical behavior," which

---

[12]We are unable to exclude the possibility that Ms. Adams' request that Spearman bring $217,000 plus tax to her office so that she could purchase an automobile was anything more than a joke. *But see supra* note 5 (noting that Ms. Adams' expensive luxury automobile was observed at Spearman's residence during the period of the conspiracy, and that, according to government counsel, Ms. Adams had purchased an automobile for her sister, he believed, in the name of her mother).

Local Criminal Local Rule 57.8(e) defines as conduct "that violates the Texas Disciplinary Rules of Professional Conduct."[13]

Texas Disciplinary Rule 4.01(a) prohibits a lawyer from knowingly making a "false statement of material fact or law to a third person" "[i]n the course of representing a client." Tex. Disciplinary Rule 4.01(a).[14]  The Estes Report finds that the "evidence [led] [Ms. Estes] to believe that Ms. Adams lied to Assistant U.S. Attorneys responsible for the filtered review for privileged materials about whether she was actually the person who sent the text messages that were attached to the Government's Notice of Potential Conflict."  Estes Report 18-19.  Judge Toliver made a similar finding at the February 6, 2019 hearing on the government's Notice of Potential Conflict.  In her oral bench ruling, she found that Ms. Adams "actually lied about whether or not she was the person identified in the . . . text message[s] . . . between herself and her client that are presented in Exhibit B of the Government's motion."  Spearman Hrg. Tr. 59.  In Judge Toliver's written decision, she found that "[t]he evidence establishes that Attorney Adams is the person identified as 'Temani' in the text message exchanges filed" with the government's notice.  *Spearman* Feb.

_____

[13]Even if we did not find that Ms. Adams engaged in misconduct by lying to the filter team, we would conclude that this conduct is part of a continuum of dissembling and of a pattern of "close calls" concerning compliance with ethical rules that supports our ultimate conclusion about what is the least restrictive sanction to impose.

[14]The Fifth Circuit has held in the civil context that discipline may be imposed for "knowingly and deliberately ma[king] blatantly incorrect discovery responses" and "cover[ing] up [the] lapse with outright deception[.]" *Crowe v. Smith*, 151 F.3d 217, 239 (5th Cir. 1998).

6, 2019 Order at 1.  Judge Toliver also found that "Attorney Adams has exhibited behavior in contravention of the law and rules of ethics," *id.*, and this order formed the basis for Ms. Adams' removal from the Criminal Justice Act Panel ("CJA Panel") (which we discuss below in the context of the *Contreras* case).[15]

There is ample support in the record to find under a clear and convincing evidence standard that Ms. Adams made false statements of material fact to third persons (members of the government filter team) in the course of representing Spearman.  During the course of representing Spearman, Ms. Adams asserted in a September 12, 2018 email to the government filter team: "My contact information is saved in Mr. Spearman's phone several different ways.  Most of the messages that are listed under my name aren't from me."  Estes Report Ex. B at 6.  The following day, she responded to the filter team's request for more information, stating: "The only other number Mr. Spearman contacted me on was . . . 9779, and that was only a handful of times.  This line was assigned to a contract paralegal that used to work with me.  She and Mr. Spearman dated at some point."  *Id.* at 4.  Ms. Adams then stated that "the majority of the text messages under Temani aren't from me."  *Id.*

These statements were undoubtedly material, if only due to their relevance to the

---

[15]Judge Toliver did *not* find that Ms. Adams lied about the authorship of the text messages during the February 6, 2019 hearing, although a fair reading of the hearing transcript leads inexorably to the conclusion that Ms. Adams was avoiding direct and candid answers to many of Judge Toliver's questions.  When government counsel asked Judge Toliver to inquire of Ms. Adams "why she lied to the filter team and initially said she was not the author of those text messages," Spearman Hrg. Tr. 33, Judge Toliver declined to do so.

government's search of Spearman's cell phone and whether particular communications were protected from disclosure to the government by the attorney-client privilege. But at a time when Spearman had not yet entered a guilty plea and might still proceed to trial, the text messages were also material to whether Ms. Adams was laboring under a conflict of interest and should withdraw or be disqualified based on her alleged involvement in money laundering and as a potential witness at trial.

Ms. Adams' conduct before this panel compounds her misconduct regarding the authorship of the text messages: Ms. Adams continued to misrepresent the facts to this panel in the Adams Response, avoided direct questions about this issue, and displayed a lack of candor during the show cause hearing.

Ms. Adams asserted in the Adams Response that "[i]t should be noted that the privileged text messages between Ms. Adams and Mr. Spearman were from a *different telephone number* than the *other messages*, and were saved under a *different name*," apparently attempting to lead the panel to believe that she was not the author or recipient of the intimate text messages in question. Adams Resp. 9 (emphasis added).

And to make matters worse, during the show cause hearing, after a panel member advised Ms. Adams that there was an issue regarding whether she had lied to the government and to the panel about the authorship of the text messages, Ms. Adams attempted to avoid a direct answer. She responded that she had not gone through every single text message; that she has ten phone lines that everyone in her office uses; that she had texted Spearman from three different phones; and that the persons who used her phone were she, her assistant (who

at some point was Spearman's daughter), and an intern.  When asked directly whether the phone was hers, a contract paralegal's, or someone else's, Ms. Adams responded that all the phones were "legally" hers.  Show Cause Hrg. Tr. 160.[16]  Only when pressed about whether she wrote the text messages did Ms. Adams admit that some of the messages were from her.

The panel member then sought an answer to the assertion in the Estes Report that, based on the evidence, Ms. Estes believed that Ms. Adams had lied to the filter team about whether she was actually the person who had sent the text messages.  Ms. Adams responded that some messages were from her and there was another number that she texted Spearman on as well.  Ms. Adams then volunteered the irrelevant response that there were several pictures of various women and videos of Spearman and his girlfriend and other women, so if there was anything going on between Spearman and her, it was not much because there were hundreds of photos and videos, and she was not in a single one.  In sum, when given the opportunity to respond directly to the allegation that she had lied to the government filter team and to this panel, and to comply with her duty of candor, Ms. Adams dodged the questions, offered various half-truths (such as that some messages were from her), and proffered various non sequiturs.

Accordingly, although we decline under a clear and convincing evidence standard to find that Ms. Adams engaged in most of the misconduct that the Estes Report finds

---

[16]"Show Cause Hrg. Tr." means an unofficial transcript of the August 4, 2020 show cause hearing.  Pagination used in this decision may change when the court reporter's official transcript is filed.

concerning the *Spearman* case, we find that she did engage in unethical behavior, sanctionable under Local Criminal Rule 57.8(b)(3), by lying to the government filter team, in violation of Texas Disciplinary Rule 4.01(a), and that this unethical behavior was compounded by her conduct before this panel.

IV

We now turn to the allegations of misconduct in the *Contreras* case.

A

Ms. Adams was a member of this court's CJA Panel and was therefore eligible to be appointed to represent indigent criminal defendants. Following her removal as counsel in *Spearman*, however, Judge Kinkeade removed Ms. Adams from the CJA Panel. Because Ms. Adams was no longer a member of the CJA Panel, Judge Kinkeade on September 4, 2019 also removed her as appointed counsel in *Contreras* for defendant Armando Contreras-Martinez ("Contreras") and appointed Carolyn Hill, Esquire, in Ms. Adams' place. Two days later, Ms. Adams filed a motion to substitute herself as Contreras' *retained* attorney. Judge Kinkeade denied the motion. In a September 12, 2019 order, he explained that, in *Spearman*, Judge Toliver found, *inter alia*, that Ms. Adams "ha[d] exhibited behavior in contravention of the law and rules of ethics," had determined that she was disqualified, and had terminated her as counsel, after which Ms. Adams was removed from the CJA Panel. *Contreras* Sept. 12, 2019 Order at 2.[17] In the same order, Judge Kinkeade directed that Ms. Adams "have no

---

[17]The order mistakenly states that Ms. Adams was *appointed* counsel in *Spearman*. *See Contreras* Sept. 12, 2019 Order at 2. This error does not affect our decision or

further communication with [Contreras] in any legal capacity."  *Id.*

In a *pro se* handwritten letter dated the next day (September 13, 2019) and filed a few days later, Contreras asked Judge Kinkeade to reconsider his decision.  On September 23, 2019 Ms. Adams filed a motion for reconsideration, which Judge Kinkeade referred to Judge Toliver.  After the government responded to the motion, Ms. Adams filed on Contreras' behalf an October 17, 2019 motion to strike the government's response and an October 22, 2019 motion for leave to file a reply to the government's response.

Following an October 23, 2019 hearing, Judge Toliver denied the motion for reconsideration.  In her oral bench ruling, Judge Toliver noted that in *Spearman* she had indicated on the record that, under the local criminal rules, an attorney would be subject to discipline if she did not follow all the rules of this court, including Texas Rule of Disciplinary Procedure 4.02, which provides that a lawyer shall not communicate, call, or encourage another to communicate about the subject of representation with a person who is represented by another attorney.  She found that Ms. Adams would not have violated that rule by returning Contreras' call to inform him that Ms. Hill had been appointed and that Ms. Adams was no longer his attorney.

But Judge Toliver also found that:

(1) continuing to explain to a client what his rights were regarding his case, regarding retaining another counsel, and regarding retaining counsel and procedures for doing so

---

reasoning.

violated the rule, or at least the spirit of the rule, whose intent is that no attorney interfere with the attorney-client relationship between a person defending a case and his attorney;

(2) communications with Contreras through his sister, especially after the court ordered that she not have any communication with Contreras regarding legal matters, violated not only the ethical rule but also Judge Kinkeade's order and the spirit of his order;

(3) Ms. Adams' assertions or suggestions that she thought she was communicating solely with Contreras' sister and not with Contreras through his sister were wholly not credible, especially in light of the fact that, based on those communications, Ms. Adams filed a motion with the court that, according to Contreras' hearing testimony, he expressly asked his sister to request Ms. Adams to file;

(4) Ms. Adams knew that there was a prohibition on this kind of conduct, yet she engaged in that communication indirectly with Contreras, in violation of both the spirit and the substance of Judge Kinkeade's order and Texas Disciplinary Rule 4.02;

(5) it lacked credibility that Ms. Adams would not realize that, when she was stating first to Contreras and later to his sister that Contreras could hire an attorney (whether her or another attorney) if he chose to, she was not suggesting to Contreras that she was available to be hired;

(6) considering that Ms. Adams knew she was appointed counsel because Contreras did not work, had been (and later was not) receiving workers' compensation, and was not working and did not have the financial means to hire her, it is incredible that Ms. Adams was not attempting to usurp the court's order denying her motion to substitute herself as retained

counsel when she made no fee arrangements with him, which are required under the Texas Disciplinary Rules to be stated with the client up front, yet pursued becoming his retained counsel; and

(7) Ms. Adams had attempted to usurp or avoid Judge Kinkeade's clear order denying her motion to be substituted as retained counsel.

Judge Toliver then added the following rationale for denying the motion for reconsideration: Ms. Adams' prior demonstrations of lack of judgment, ethical lapses, and conflicts that Ms. Adams refused to acknowledge in the *Spearman* case, the findings of the court in that regard, and the continuing unethical behavior in this case in communicating with Contreras directly and indirectly, in contravention of the Texas Disciplinary Rules.

Addressing Ms. Adams directly, Judge Toliver stated that, if Judge Kinkeade's order was not clear, in addition to his order, Ms. Adams was not to have any communication with Contreras whatsoever because her communication, whether direct or indirect, was interfering with his relationship with the attorney who had been appointed to represent him. Specifically, Judge Toliver ordered that Ms. Adams

> not have any communication with him, including the kind of communication that you stated you had here with him in the courtroom about whatever it was. That's inappropriate, having communication with his family about his case. No one cares if you communicate with his sister or family about anything else, but about his case is prohibited.

- 24 -

Contreras Hrg. Tr. 74.[18]

In her written order filed the following day, Judge Toliver found:

(1) Ms. Adams had direct and indirect contact with Contreras, a party whom she knew to be represented by other counsel, in contravention of Texas Disciplinary Rule 4.02;

(2) Ms. Adams had contact through a third party with Contreras, whom she knew to be represented by other counsel, regarding matters pertaining to this case, in violation of the court's September 12, 2019 order that she have no further communication with Contreras in any legal capacity;

(3) Ms. Adams demonstrated extremely poor judgment when, in an apparent attempt to circumvent the court's September 4, 2019 order removing her as appointed counsel, she suggested to Contreras and his sister that she could nonetheless represent him if she were retained, when Ms. Adams was well aware of the circumstances of Contreras' indigence, including his unemployment, which the court had previously determined qualified him for appointed counsel;

(4) Ms. Adams never communicated to Contreras, orally or in writing, her anticipated fee or "the basis or rate" of that fee;

(5) after Ms. Adams was dismissed as counsel in this case, her conduct interfered with, and negatively impacted, the attorney-client relationship between Contreras and Ms.

---

[18]"Contreras Hrg. Tr." means the transcript of the October 23, 2019 hearing before Judge Toliver on Contreras' September 23, 2019 motion for reconsideration of the order denying Ms. Adams' motion to be substituted as retained counsel.

Hill, his current appointed attorney; and

(6) as Ms. Adams was previously admonished in *Spearman*, Local Criminal Rule 57.8 provides that counsel's "unethical behavior," defined as "conduct undertaken in or related to a criminal proceeding in this court that violates the Texas Disciplinary Rules of Professional Conduct," is "grounds for disciplinary action in this court." *Contreras* Oct. 24, 2019 Order at 2 (quoting Local Criminal Rule 57.8(b) and (e)).

Judge Toliver also pointed out that Ms. Adams' conduct in *Spearman* was sufficiently egregious to warrant the court's exercise of discretion to remove her as counsel in *Contreras*, and that the decision to remove her was vindicated by Ms. Adams' actions in response to her dismissal, which included flouting the Texas Disciplinary Rules and disobeying a direct court order. Judge Toliver concluded her written order by ordering Ms. Adams, as she had been admonished in open court, "to have no contact, directly or indirectly, with Defendant Contreras, Defendant Contreras' relatives, or anyone purporting to be Defendant Contreras' representative about anything whatsoever, while this case is pending." *Id.* at 2-3.

B

As in *Spearman*, the Estes Report concludes in *Contreras* that there are multiple grounds to discipline Ms. Adams for unethical conduct.

The Estes Report relies on the following as evidence of conduct unbecoming a member of the bar, failure to comply with a rule or order of the court, or unethical behavior. Ms. Adams' pleadings and the transcript of the October 23, 2019 hearing establish that Ms. Adams had direct and indirect contact with Contreras, someone she knew was represented

- 26 -

by Ms. Hill, about his case and his retaining Ms. Adams, thereby violating Texas Disciplinary Rule 4.02 and the order disqualifying Ms. Adams.  Ms. Adams also had contact with Contreras through his sister regarding matters related to his legal defense in what can only be reasonably seen as an attempt to circumvent the court's order removing Ms. Adams from representing Contreras and ordering Ms. Adams not to have contact with Contreras in any legal capacity.  Ms. Adams thereby violated the court's September 12, 2019 order that she have no further communication with Contreras in any legal capacity.

According to the Estes Report, when Judge Toliver questioned Ms. Adams at the October 23, 2019 hearing about the timing of conversations between Ms. Adams and Contreras' sister that were contained in text messages, Ms. Adams said that she could not provide the dates for those communications because she did not have her phone with her. But, as the Estes Report finds, Ms. Adams was later seen with her phone in the courtroom and at the courthouse following the hearing.

According to the Estes Report, Ms. Adams suggested to Contreras and his sister that she could represent him if she were retained.  But Ms. Adams should have been aware of Contreras' indigence.  Although Contreras represented that he believed his family would help him, Ms. Estes did not see evidence that Ms. Adams communicated to Contreras, orally or in writing, her anticipated fee or "the basis or rate" of that fee, which support the conclusion that Ms. Adams engaged in unethical behavior by violating Texas Disciplinary Rule 1.04.

According to the Estes Report, Ms. Adams' conduct after she was dismissed as Contreras' counsel interfered with, and negatively impacted, the attorney-client relationship

between Contreras and Ms. Hill and undermined (initially) the trust needed for effective representation.

The Estes Report also states that, before the October 23, 2019 hearing commenced on the motion for reconsideration, Ms. Adams seemed to flout the court's order that she not speak to Contreras in any legal capacity when she sat next to Contreras, began talking to him, and refused Ms. Hill's request that she not to speak to Contreras and move away, claiming they were only talking about the weather and traffic.  A court deputy had to ask Ms. Adams to stop speaking with Contreras.  And when after the hearing Judge Toliver asked everyone to leave the courtroom except Contreras and Ms. Hill, Ms. Adams did not leave until asked to do so by the court deputy.  Following the hearing, Ms. Adams attempted unsuccessfully to speak to Contreras.

The Estes Report also concludes that, before being removed from representing Contreras, Ms. Adams engaged in unusual conduct that tends to show the inability to conduct litigation properly.  She did not return calls or emails to government lawyers and did not attempt to resolve the case despite a favorable plea offer; she did not want to participate in a reverse proffer of evidence that the government offered; and she contacted a detention facility to obtain jail calls of prisoners who were not her clients, without going through the proper process of obtaining a subpoena, which also indicates conduct unbecoming a member of the bar.

C

1

We turn first to the conduct that we find by clear and convincing evidence is unbecoming a member of the bar, fails to comply with a rule or order of the court, and is unethical conduct.

Following Judge Kinkeade's September 4, 2019 order removing Ms. Adams as Contreras' counsel and his September 12, 2019 order prohibiting Adams from communicating with Contreras in any legal capacity, Ms. Adams filed not one, but *three* motions on Contreras' behalf—a September 23, 2019 motion to reconsider the ruling removing her as counsel, an October 17, 2019 motion to strike the government's response to the motion to reconsider, and an October 22, 2019 motion for leave to file a reply to the government's response.  Judge Toliver denied the motion to strike in an electronic order, holding that "because Ms. Adams is not counsel of record for Defendant at this juncture, she lacks authority to file any pleading on his behalf."  *Contreras* Oct. 18, 2019 Order (electronic).  Thus even if we assume *arguendo* that no other evidence exists to show that Ms. Adams communicated with Contreras, the most plausible inference from Ms. Adams' filing *three* motions on Contreras' behalf *after* she had been removed from the case and ordered to cease communication with him in any legal capacity is that Ms. Adams in fact communicated with him for approval to file the motions, in violation of Judge Kinkeade's September 12, 2019 order.

But the evidence of Ms. Adams' misconduct is more robust.  As the October 23, 2019

- 29 -

hearing on the motion for reconsideration makes clear, Ms. Adams intentionally violated Judge Kinkeade's September 12, 2019 order by communicating with Contreras through his sister, which she attempted to conceal by repeatedly stating that she had had no contact with him following that order and misrepresenting the nature and frequency of her conversations with his sister.  Even after admitting that she had spoken with Contreras' sister about the case after September 12, 2019, Ms. Adams represented to Judge Toliver that she had just *one* conversation with Contreras' sister to inform her that "we cannot have any additional contact" and that "from there, there was no more conversation," Contreras Hrg. Tr. 23, only to reveal later that she had continued to communicate with Contreras' sister, conceding that "[w]e have some text messages that are after this, [and] I let her know what their options were," *id.* at 25.  When asked what options were provided, Ms. Adams responded: "I don't recall.  I don't have my phone with me, and I did not bring the messages out to bring to the Court 'cause I didn't think they were going to be relevant."  *Id.* at 27-28.  Ms. Adams was later seen at the courthouse with her phone, and, as she acknowledged in her response to this panel, she did have a cell phone with her, which she "powered on" after the hearing "so that she could order her Uber, as she does after any court setting."  Adams Resp. 38.[19]

---

[19]At the show cause hearing, Ms. Adams asserted that the appropriate response to Judge Toliver's question should have been that she did not have "that phone," Show Cause Hrg. Tr. 187, because she brings to court a phone that is not linked to her office's phone system so that no calls are coming through, and that this phone is used to order her Uber to leave court.  We do not find this explanation to be credible or sufficient to rebut evidence that she misrepresented to Judge Toliver that she did not have with her the phone that contained the text messages on which she was relying.  Indeed, phones can be turned off before court begins, and Ms. Adams did not produce *any evidence* of her possession of two phones,

If there were any doubt about whether Ms. Adams was communicating with Contreras through his sister as an intermediary, Contreras' testimony eliminates it. He explicitly testified that, following the order prohibiting her from communicating with him about any legal matters, he asked through his sister that Ms. Adams file a motion on his behalf:

> THE COURT: Did you have any contact with Ms. Adams after that first telephone call?
>
> MR. CONTRERAS: No.
>
> THE COURT: Okay.
>
> MR. CONTRERAS: Not ever since. Just that.
>
> THE COURT: Did you ask your sister to contact Ms. Adams on your behalf?
>
> MR. CONTRERAS: Well, I asked—not that same day, but I asked her—'cause I knew that we couldn't talk after they sent me that letter, so I asked her if she could file a motion, you know, too, or something like that.
>
> THE COURT: You asked Ms. Adams to?
>
> MR. CONTRERAS: Yes.
>
> THE COURT: How did you ask her that?
>
> MR. CONTRERAS: Through my sister.
>
> THE COURT: So you sent word through your sister to Ms. Adams that you wanted her to file a motion?
>
> MR. CONTRERAS: Yes, ma'am.

---

despite being on notice that her representations to Judge Toliver regarding whether she had her cell phone in court that day would be an issue in this proceeding.

Contreras Hrg. Tr. 61-62.

Following this testimony, and Ms. Adams' insistence that she "had no contact with [Contreras]," Judge Toliver explained: "But you've had contact with his sister . . . [a]bout his case," that is,"[his sister] communicated his wishes to you despite the admonition that you not contact him about his case," and "[h]e told his sister to . . . ask you to file a motion to become his attorney, and that's exactly what you did," *id.* at 64-65. Judge Toliver found in her written order that Ms. Adams "had contact through a third party with Defendant Contreras, . . . regarding matters pertaining to this case, in violation [of] the Court's September 12, 2019 order that she 'have no further communication with Defendant in any legal capacity.'" *Contreras* Oct. 24, 2019 Order at 1. After considering the entire record before us, we find by clear and convincing evidence that Ms. Adams intentionally violated Judge Kinkeade's September 12, 2019 order.

Moreover, Ms. Adams' conduct at the October 23, 2019 hearing suggests, at best, a lack of judgment, and, at worst, a flagrant disregard for court orders. With full knowledge that she had been ordered not to communicate with Contreras in "any legal capacity" and that Judge Toliver had already issued an electronic order explaining that she was not counsel of record for Contreras, Ms. Adams chose to sit next to, and converse with, Contreras and his sister in the courtroom on the morning of the reconsideration hearing. When Ms. Hill asked her to move away from Contreras, Ms. Adams "refused to comply, claiming they were only talking about the weather and traffic." Estes Report 24. Ultimately, Ms. Adams did not cease communicating with Contreras until the court deputy asked her to stop. *See id.* It is

"concerning to us [that] it took a double whammy of the court," including Judge Kinkeade's September 12 order and Judge Toliver's subsequent order, to get Ms. Adams to understand and comply with the intent and import of Judge Kinkeade's order.  Show Cause Hrg. Tr. 183. And it is disturbing that Ms. Adams—who had been removed as Contreras' counsel and barred from communicating with him in "any legal capacity"—would have thought it appropriate, and even defensible before this panel, to justify communicating with him before the commencement of a court hearing convened to address the very issue of her representation of Contreras because they were discussing the weather or traffic.  Ms. Adams was present as a lawyer seeking court relief related to her request to represent Contreras, not as a casual observer seeking to pass the time.

Moreover, the evidence demonstrates that Ms. Adams repeatedly presented this panel with falsehoods regarding her conduct.  Despite her statements to the contrary at the October 23, 2019 hearing on the motion for reconsideration, Ms. Adams continued to affirmatively represent to this panel in her response that she had "never 'had contact with Defendant Contreras-Martinez through his sister,'" and that "[t]he record is void of any evidence that Ms. Adams contacted Mr. Contreras-Martinez's sister to relay information to Mr. Contreras-Martinez."  Adams Resp. 33.  Further, despite Judge Toliver's clear explanation to Ms. Adams that communication *through* Contreras' sister was still communication *with* Contreras, Ms. Adams continued to assert to the panel in her response and in her statements at the show cause hearing that she "did not communicate with Mr. Contreras."  Show Cause Hrg. Tr. 179.  Indeed, Ms. Adams was asked directly at the show cause hearing whether a

- 33 -

letter written by Contreras and delivered to Ms. Adams by his sister, upon which Ms. Adams acted by filing a motion, would constitute "communication" in violation of Judge Kinkeade's order.  In response, Ms. Adams rationalized that because she "did not *initiate* contact with him or with his family," *id.* at 181 (emphasis added), she was still in compliance with Judge Kinkeade's order.  Such a response not only attempts to split hairs but disregards other evidence in the record demonstrating that she *did* initiate contact with his sister.  *See* Contreras Hrg. Tr. 65 ("His sister and I had several communications. . . . I contacted her initially[.]").

It is difficult to comprehend how—following Ms. Adams' statements at the October 23, 2019 hearing, Judge Toliver's findings, and Judge Toliver's subsequent written order—Ms. Adams could with a straight face represent to this panel that she did not communicate with Contreras' sister; that, to the extent she *did* communicate with his sister regarding the case or accept a letter from her and file a motion on Contreras' behalf in response to the letter, these exchanges did not constitute communication with Contreras; and that, to the extent these exchanges *did* constitute communication with Contreras, she did not violate Judge Kinkeade's order because she did not *initiate* the communications.  Indeed, the only plausible conclusions from Contreras' testimony, Ms. Adams' statements to Judge Toliver, Ms. Adams' assertions in her response to this panel, and her circuitous, if not completely inconsistent and disingenuous, answers to the panel's questioning, are that Ms. Adams knowingly violated Judge Kinkeade's September 12, 2019 order multiple times and that she attempted to conceal this from this panel through dissembling and untenable

interpretations of the order itself.

In addition to failing to comply with an order of the court and attempting to obscure this fact at every stage of this proceeding, there is clear and convincing evidence that Ms. Adams engaged in unethical behavior by failing to disclose her fees before agreeing to represent Contreras, in violation of Texas Disciplinary Rule 1.04(c).  Texas Disciplinary Rule 1.04(c) provides that "[w]hen the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."  *Id.*  Although Ms. Adams contends in her response and in her summation to the panel that she "informed Mr. Contreras [of] what fees he may incur if he wanted to retain her services" and that "Mr. Contreras agreed to Ms. Adams' fees," Adams Resp. 32, Contreras testified otherwise.  At the October 23, 2019 hearing on the motion for reconsideration, Contreras testified that Adams never disclosed her fees:

> MR. CONTRERAS: I told [Ms. Adams] that if she could file a motion and if she could be my attorney, then we were going to see before the judge if they allow her to be my attorney and then we would talk about the arrangement.

> THE COURT: So she didn't even tell you that if you hired her what—what her cost would be?

> MR. CONTRERAS: No. But I know that you have to pay, you know, 'cause when the attorneys don't—

> THE COURT: Well, usually those are things that the attorney discusses with a potential client. Did she discuss with you how much it would cost or what she would charge to represent you on this case?

> MR. CONTRERAS: No. She just said that it would—you know, there would be a cost, but, no, we didn't discuss how much.

> THE COURT: Nothing at all?

> MR. CONTRERAS: No.

*Contreras* Oct. 23, 2019 Hrg. Tr. 48-49. Contreras then testified that Ms. Adams told him the cost would "not be that much." *Id.* at 49. Although Ms. Adams asserted at the October 23, 2019 hearing that Contreras simply did not remember that they "spoke in detail" about "what the expected cost would be for [her] to represent him," *id.* at 66, she was unable to answer Judge Toliver's questions regarding the fee:

> THE COURT: What did you tell him he was going to have to pay? [Bec]ause he doesn't recall you telling him to pay you anything.

> MS. ADAMS: I don't have that with me, but I know I did let him know about the cost of going to trial, the process and the cost associated with subpoenas and things like that. And I recall him saying something about him having to discuss it with his family.

*Id.*

Judge Toliver found in her written order that Ms. Adams "never communicated to Defendant Contreras, orally or in writing, her anticipated fee or the 'basis or rate' of that fee," in violation of Texas Disciplinary Rule 1.04. *Contreras* Oct. 24, 2019 Order at 1. She found this to be particularly of concern given that Ms. Adams "was well aware of the circumstances of Defendant Contreras' indigency, including his unemployment, which the Court had previously determined qualified him for court-appointed counsel." *Id.* Ms. Adams

- 36 -

has provided no evidence, such as the fee she proposed or any notes taken before, during, or after the call regarding the basis or rate of the fee, to rebut the clear evidence against her.

We find by clear and convincing evidence that Ms. Adams failed to communicate to Contreras the basis or rate of the fee, and thus engaged in unethical conduct by violating Texas Disciplinary Rule 1.04(c).  *See McCleery v. Comm'n for Lawyer Discipline,* 227 S.W.3d 99, 106 (Tex. App. 2006, pet. denied) (finding a violation of Texas Disciplinary Rule 1.04(c) where lawyer did not disclose a fee arrangement until the eve of trial).  We also find that Ms. Adams has not been truthful in her representations to Judge Toliver or to this panel concerning her failure to disclose a fee arrangement.

In sum, for the reasons explained, we find by clear and convincing evidence that Ms. Adams engaged in conduct that is unbecoming a member of the bar,  fails to comply with at least an order of this court, and is unethical conduct.

2

Regarding the remaining allegations, i.e., that Adams violated Texas Disciplinary Rule 4.02(a) (as opposed to a court order) governing communication with a represented party and that her tactics evidence an inability to conduct litigation properly, we conclude that there is insufficient proof to find by clear and convincing evidence that Ms. Adams engaged in misconduct.

As with *Spearman*, because we are declining to find that Ms. Adams engaged in misconduct, it is unnecessary to explain our decisions in detail.  Stated briefly, there is evidence that Contreras actually initiated the *first* contact with Ms. Adams following her

removal and Ms. Hill's appointment as counsel.  *See* Texas Disciplinary Rule 4.02(d); *see also In re Medrano*, 956 F.2d at 103 ("[T]here can be no disbarment [or other discipline] based upon a violation of Rule 4.02" absent "proof that the lawyer initiated the prohibited communication . . . established by clear and convincing evidence.").  So while Ms. Adams clearly violated the prohibition of the September 12, 2019 order that she not communicate with Contreras in any legal capacity, we are unable to find by clear and convincing evidence that she violated Rule 4.02(a).

Additionally, even if we assume *arguendo* that her litigation tactics in *Contreras*, including failing to engage in a reverse proffer session, failing to communicate with government counsel, and seeking jail calls from detention facilities, might be validly criticized, we are unable to find by clear and convincing evidence that Ms. Adams thereby engaged in misconduct in the form of an inability to conduct litigation properly.

V

Having concluded under a clear and convincing evidence standard that Ms. Adams engaged in misconduct in both the *Spearman* and *Contreras* cases, we must now decide what sanction, if any, to impose.

A

Under Local Criminal Rule 57.8(b), "after giving opportunity to show cause to the contrary, [this panel] may take any appropriate disciplinary action against a member of bar" for, *inter alia*, conduct unbecoming a member of the bar, failure to comply with any order of this court, and unethical behavior.  In the panel's June 29, 2020 order, it advised Ms.

Adams:

> [i]f disciplinary action is imposed, possible forms of discipline
> include, but are not limited to, required ethics training, a private
> or public reprimand, suspension from practicing in this court,
> and removal from the Bar of this court.  Ms. Adams may also be
> ordered to notify any court, bar, or law-related organization to
> which she is admitted or is a member of any disciplinary action
> taken by the panel.

*In re Adams* June 29, 2020 Order at 2.  In determining the appropriate sanction, the panel

"must use the least restrictive sanction necessary to deter the inappropriate behavior." *In re*

*Luttrell*, 749 Fed. Appx. at 286 (quoting *In re First City Bancorporation of Tex. Inc.*, 282

F.3d 864, 867 (5th Cir. 2002)).  And we must consider all factors, including the "duty

violated, the attorney's mental state, the actual or potential injury caused by the attorney's

misconduct, and the existence of aggravating or mitigating factors." *In re Sealed Appellant*,

194 F.3d 666, 673 (5th Cir. 1999) (citing ABA Standard for Imposing Lawyer Sanctions 3.0).

## B

Turning first to the duty violated, "[i]t goes without saying that an attorney's duty of

candor is paramount." *In re Grodner*, 2014 WL 4365080, at *8; *see also In re Ramos*, 679

Fed. Appx. 353, 358 n.5 (5th Cir. 2017) (per curiam) ("[W]e urge . . . any practicing attorney

to be mindful of the fact that personal integrity is essential to the due administration of justice

and a fundamental requirement for an officer of the court.").  As we discuss *infra* at § V(G),

Ms. Adams' mendacities in *Spearman* and *Contreras* fall on a continuum of deception, and

the pattern found in her lack of candor and outright prevarications are on full display in

proceedings before a magistrate judge of this court and this panel.  This misconduct clearly

disregards "duties owed to the public, the profession, and the judicial system." *In re Sealed Appellant*, 194 F.3d at 674.

## C

We next consider Ms. Adams' mental state. There is no indication in the record, nor is it asserted, that Ms. Adams was laboring under some form of mental limitation or malady when she engaged in the misconduct at issue. By all indications, Ms. Adams was and is an intelligent and articulate professional. But this actually cuts against her because it supports our view that she has at material times acted by carefully crafted design to skirt a clear court order and to obfuscate, dissemble, and lie outrightly when dealing with the filter team, Judge Toliver, and this panel. We think it likely, for example, that Ms. Adams' decisions to file an unsworn response to the Estes Report, *see supra* note 3, not to call witnesses at the show cause hearing (who would have been subject to questioning under oath by Ms. Estes and this panel), and not to testify under oath herself at the hearing were calculated: the product of an intelligent mind, but one that lacks a fully functioning ethical compass.

## D

As to the actual or potential injury caused, the fact "[t]hat no injury occurred may serve as mitigation," but "[i]n determining the baseline discipline, . . . the distinction between actual and potential injury need not be made." *In re Sealed Appellant*, 194 F.3d at 673-74. We are unable to conclude that no actual or potential injury occurred as a result of Ms. Adams' misconduct. At a minimum, her flouting of the court's order not to communicate with Contreras interfered with the ability of Ms. Hill (her successor counsel) to communicate

with him.  And the potential injury that could result from failing to disclose her fees before agreeing to represent Contreras, an indigent defendant, is self-evident.  Moreover, misrepresentations cause injuries "of the gravest type, as [they] call[] into question the integrity of the legal profession and the judicial system in the eye of the public."  *In re Grodner*, 2014 WL 4365080, at *9.

E

We now consider whether there are any mitigating factors.  Considering the number of years Ms. Adams has been practicing, the intentional nature of the misconduct in question, the pattern of repeated misrepresentations, and the absence of any attempt to remedy her misconduct, we find no mitigating factors that warrant a less severe sanction than a six month suspension coupled with the requirement that Ms. Adams complete 15 hours of CLE courses that are accredited by the State Bar of Texas and qualify for credit in legal ethics.  *Cf. In re Ramos*, 679 Fed. Appx. at 358 (reducing sanction where district court "did not give any weight to the[] mitigating factors" of inexperience and an attempt to remedy the misconduct).  The record clearly demonstrates that, even after being terminated as Spearman's counsel and removed from the CJA Panel for unethical conduct in the *Spearman* case, Ms. Adams intentionally circumvented at least one court order and intentionally made misrepresentations to Judge Toliver, including that she had not engaged in communications that violated Judge Kinkeade's order, that she did not have possession of her cell phone that contained pertinent text messages, and that she did discuss her attorney's fees with Contreras.  Moreover, she made misrepresentations to this panel.  And as we explain next, not only do we find no

- 41 -

mitigating factors, there are clear aggravating factors that inform our decision regarding the appropriate sanction.

F

We find next that there are clear aggravating factors in this matter and that "the existence of [such] aggravating factors favors a strong sanction." *In re Grodner*, 2014 WL 4365080, at *9.

It is an aggravating factor that, in *Spearman*, Judge Toliver specifically warned Ms. Adams of the potential consequences of unethical conduct, but Ms. Adams did not heed that warning in *Contreras*, where she was removed as counsel as a direct consequence of her removal from the CJA Panel for engaging in unethical conduct in *Spearman*, and yet continued to file motions on his behalf and communicate with him after being ordered to refrain from doing so.

But more significant is the revealing and disquieting response that Ms. Adams gave when a panel member specifically asked her at the show cause hearing what she would have learned from this experience if the panel declined to impose discipline. Her response strongly suggests that she has refused to acknowledge her own wrongdoing, and, in fact, has learned nothing salutary at all. Ms. Adams indicated that she had gleaned from this proceeding that she should not communicate with prosecutors via telephone, that she should keep better records to fend off false allegations made against her, and that she should fire her briefing attorney, who thought filing the motion for reconsideration would be acceptable. Ms. Adams also mentioned that a friend suggested that she "be nicer or more open to

prosecutors," but Ms. Adams rejected such a suggestion "because look at what happened. I got attacked."  Show Cause Hrg. Tr. 192.

But what about her misconduct in the two cases that are the subject of this disciplinary matter?  Did Ms. Adams learn any pertinent lessons?  Obviously not, because her response at the show cause hearing attempted to deflect her own blame, shift the blame to others, and contemplate changes in behavior that would actually exacerbate the misconduct that gave rise to this proceeding.  Indeed, "[a] fair inference from h[er] repeated violations of h[e]r ethical and moral obligations . . . is that [s]he intentionally" violated court orders and made misrepresentations to cover up her misconduct, "knowing that it was wrong." *In re Ray*, 951 F.3d at 655.  This factor weighs in favor of suspension because it "suggests that something more than reprimand is required."  *In re Grodner*, 2014 WL 4365080, at *8 (imposing suspension where attorney "brazenly refused to acknowledge her culpability, insisting that her misrepresentations were, at most, 'technical[]' errors.").

## G

In assessing what is the least restrictive sanction in this matter, it is important to evaluate Ms. Adams' misconduct holistically rather than piecemeal.  Examining the big picture, we see clear evidence of a continuum of deception and inexcusable conduct.

This attorney discipline matter started with the *Spearman* case.  The government was concerned that Ms. Adams' intimate relationship with Spearman and her own possible participation in money laundering might require her removal as Spearman's counsel.  A government filter team had been analyzing text messages that appeared to have been

exchanged between Spearman and Ms. Adams, and Ms. Adams had denied to the filter team her authorship of many of them.  At the February 6, 2019 hearing on the matter, Judge Toliver disqualified Ms. Adams as Spearman's retained counsel.  She found that Ms. Adams had committed several ethical violations and that there was evidence that Ms. Adams had actually lied about whether she was the person identified in the text messages between her and Spearman.  Judge Toliver also admonished Ms. Adams about ethical violations and sanctions under Local Criminal Rule 57.8(b).  In a written decision that followed, Judge Toliver found that Ms. Adams had actually lied about her involvement in the text messages and had exhibited behavior in contravention of the law and ethics rules.

Ms. Adams was then removed from the CJA Panel based on her unethical conduct in *Spearman*.  As a consequence of her removal from the CJA Panel, Judge Kinkeade removed her as appointed counsel in *Contreras*.  When Ms. Adams moved to be substituted as *retained* counsel in *Contreras*, Judge Kinkeade denied the motion, noting Judge Toliver's finding in *Spearman* that Ms. Adams "ha[d] exhibited behavior in contravention of the law and rules of ethics."  *Contreras* Sept. 12, 2019 Order at 2.  He expressly ordered that Ms. Adams "have no further communication with [Contreras] in any legal capacity."  *Id.*

Rather than comply with Judge Kinkeade's order or file an appeal, Ms. Adams violated the order and attempted to circumvent it.  She communicated with Contreras both directly and indirectly through his sister, which led to her filing a motion for reconsideration of the order denying her motion to substitute.

In denying the motion for reconsideration, Judge Toliver found that Ms. Adams had

committed ethical violations.  In her oral bench ruling, Judge Toliver noted that, in

*Spearman*, she had indicated that, under the local criminal rules, an attorney would be subject

to discipline if she did not follow all the rules of this court, including the rule that addresses

communications with a person represented by another attorney.  Judge Toliver found that,

by communicating with Contreras indirectly through his sister, Ms. Adams had violated that

ethical rule and Judge Kinkeade's order barring communications with Contreras in any legal

capacity.  Judge Toliver also found not credible Ms. Adams' assertions or suggestions that

she thought she was communicating solely with Contreras' sister and not with Contreras

through his sister.  Judge Toliver then added the following rationale for denying the motion

for reconsideration: Ms. Adams' prior  demonstrations of lack of judgment, ethical lapses,

and conflicts that she refused to acknowledge in the *Spearman* case; the findings of the court

in that regard; and the continuing unethical behavior in the *Contreras* case in communicating

with Contreras directly and indirectly, in contravention of the Texas Disciplinary Rules.

During the October 23, 2019 hearing on the motion for reconsideration, Ms. Adams

not only made representations about her communications with Contreras through his sister

that were found not to be credible, she misrepresented to Judge Toliver that she did not

possess in court a cell phone that contained text messages that bore on the timing of

conversations between Ms. Adams and Contreras' sister.

And before the October 23, 2019 hearing commenced, Ms. Adams sat next to

Contreras, began talking to him, and refused his counsel's (Ms. Hill's) request that she not

to speak to Contreras and move away, claiming that she and Contreras were only talking

- 45 -

about the weather and traffic.  A court deputy had to ask Ms. Adams to stop speaking with Contreras.  Regardless what they were talking about, Ms. Adams was certainly aware of the purpose of the hearing (whether to grant reconsideration and permit her to represent Contreras as his retained counsel) and must have recognized the potential benefit of building rapport with Contreras before his potential participation in the hearing.

In sum, within a span of months, Ms. Adams engaged in unethical conduct in two different cases.  She did so in the second case (*Contreras*) after being admonished by the judge in the first case (*Spearman*) of the consequences of ethical violations—a warning that referred specifically to Local Criminal Rule 57.8(b) and that Ms. Adams clearly did not heed.

What is more, the panel's experience with Ms. Adams has been similar to Judge Toliver's at the February 6, 2019 and October 23, 2019 hearings: Ms. Adams has seemingly been unwilling to answer material questions directly and candidly, and we have found some of Ms. Adams' answers to be intentionally obtuse and disingenuous.  At the very time when candor is called for, Ms. Adams has demonstrated an apparent lack of appreciation for the circumspection that the ethical rules demand.

Finally, Ms. Adams apparently has learned nothing salutary from these proceedings.

## H

Accordingly, for the reasons explained, we find that suspension from this court's bar for six months, coupled with the requirement that Ms. Adams complete 15 hours of CLE courses that are accredited by the State Bar of Texas and qualify for credit in legal ethics, is "the least restrictive sanction necessary to deter the inappropriate behavior."  *In re Luttrell*,

749 Fed. Appx. at 286.  It is "a district court's responsibility to supervise the conduct of attorneys who are admitted to practice before it," *In re Ramos*, 679 Fed. Appx. at 356, and where, as here, an attorney continuously and intentionally disregards ethical rules when charting her course, discipline is required.  As one panel member suggested to Ms. Adams at the show cause hearing, it appears that, like Icarus, she has flown very close to the sun at times.  Perhaps Ms. Adams will now realize that she ought to orbit a little farther from the sun so as not to get burned.

## VI

### A

Effective August 21, 2020, Ms. Adams is suspended from this court's bar for a period of six months.  No later than January 21, 2021, Ms. Adams must complete 15 hours of CLE courses that are accredited by the State Bar of Texas and qualify for credit in legal ethics.[20] Of the 15 required hours, up to 3 may be satisfied by self-study credit, i.e., any CLE activity performed by Ms. Adams acting alone or while attending a non-accredited professional education activity.   No later than February 8, 2021, Ms. Adams must file in this miscellaneous case proof that she has complied with the CLE requirement.

No later than 14 days after this decision is filed, Ms. Adams must provide notice of

---

[20]Provided a course is accredited by the State Bar of Texas and qualifies for credit in legal ethics, it does not matter whether the course is a live group presentation, live or pre-recorded online course, webinar, downloadable CLE program (such as a podcast), or a program recorded onto a DVD or CD.

the decision to every court,[21] bar, and law-related organization to which she is admitted or of which she is a member, and, upon request, must provide a copy of this decision.

B

The clerk of court is directed to unseal the file in this matter, except that the following documents are to remain sealed: ECF No. 8, and all attachments; ECF No. 12, and all exhibits; ECF No. 17; and the exhibits admitted in evidence at the show cause hearing.  It is further ordered that, when filed, the transcript of the August 4, 2020 show cause hearing shall be filed under seal pending further court order.

*   *   *

For the reasons stated, we impose the attorney discipline set out in this decision.

**SO ORDERED**.

---

[21]Ms. Adams need not notify the judges of this court because they will be notified of the decision under the court's usual procedures.